UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
                                    )   7:19-CR-101-D1
            vs.                     )
                                    )
CODY ALEXANDER LOCKLEAR,            )
            Defendant.              )
_____)


AUGUST 3, 2020
SENTENCING HEARING
BEFORE THE HONORABLE JAMES C. DEVER III
UNITED STATES DISTRICT JUDGE



APPEARANCES:

On Behalf of the Government:

CAROLINE L. WEBB, ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601


On Behalf of the Defendant:

SONYA ALLEN, FEDERAL PUBLIC DEFENDER
Federal Public Defender's Office
150 Fayetteville Street, Suite 450
Raleigh, North Carolina  27601




AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

# I N D E X

### GOVERNMENT'S WITNESSES

TIMOTHY SEALY

      Direct Examination by Ms. Webb                12

HOLLIS McNEILL

      Direct Examination by Ms. Webb                17
      Cross-Examination by Ms. Allen                27
      Redirect Examination by Ms. Webb             32
      Recross-Examination by Ms. Allen             33

1          (Monday, August 3, 2020, commencing at 10:01 a.m.)

2                    P R O C E E D I N G S

3          THE COURT:  We'll next take up the sentencing of

4    Cody Locklear.

5          Good morning, Ms. Allen.  Are you and Mr. Locklear

6    ready?

7          MS. ALLEN:  Good morning, Your Honor.  Yes, we are.

8          THE COURT:  Good morning, Ms. Webb.  Is the

9    Government ready?

10         MS. WEBB:  Yes, Your Honor.

11         THE COURT:  At this time I'd ask that the defendant

12   be sworn or affirmed.

13         Stand up, please.

14      (The defendant, Cody Alexander Locklear, was duly sworn.)

15         THE COURT:  Do you understand that having been

16   sworn, that your answers to my questions are subject to the

17   penalty of perjury; and if you were to lie to me, you could be

18   prosecuted for perjury or for making a false statement?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Have you taken any medicine or any other

21   substance in the last 48 hours that would affect your ability

22   to hear and understand this proceeding?

23         THE DEFENDANT:  No, sir.

24         THE COURT:  Do you know why you're here today?

25         THE DEFENDANT:  Yes, sir.

```
 1          THE COURT:  Ms. Allen, do you have any reason to
 2   doubt Mr. Locklear's competence to go forward today?
 3          MS. ALLEN:  No, Your Honor.
 4          THE COURT:  Does the Government have any reason to
 5   doubt Mr. Locklear's competence to go forward today?
 6          MS. WEBB:  No, Your Honor.
 7          THE COURT:  Based on Mr. Locklear's answers to my
 8   questions, my observations of Mr. Locklear, and the answers
 9   from counsel, I find that he is competent.
10          Mr. Locklear, you're here today having entered a
11   plea of guilty to three charges.  The first charge is
12   conspiracy to distribute and possess with the intent to
13   distribute 40 grams or more of a mixture and substance
14   containing a detectable amount of fentanyl, 10 grams or more
15   of a mixture and substance containing fentanyl analogue, a
16   quantity of heroin and a quantity of cocaine; the second
17   charge is distribution of 10 grams or more of a mixture and
18   substance containing a detectable amount of fentanyl analogue,
19   a quantity of heroin and 40 grams or more of a mixture and
20   substance containing a detectable amount of fentanyl; the
21   third charge is possession of a firearms in furtherance of a
22   drug trafficking crime.
23          The sentencing guidelines are no longer mandatory;
24   they're advisory.
25          Nevertheless, I'm to take into account the
```

now-advisory guidelines.  I do this by initially making

findings of fact and calculating an advisory guideline range.

I'll then consider any motion that might be made that might

move that range either up or down.  I'll then consider all

arguments that your lawyer makes, both here in court and the

ones she's already made in the sentencing memo she submitted,

any statement you'd like to make about your sentence, and the

arguments that the Assistant United States Attorney makes

about your sentence.  I'll then determine your sentence and

I'll announce it here in court today.  That'll be the process

we'll follow.

       Ms. Allen, did you receive a copy of the presentence

report?

       MS. ALLEN:  Yes, Your Honor.

       THE COURT:  Mr. Locklear, did you speak with your

lawyer, Ms. Allen, about the presentence report?

       THE DEFENDANT:  Yes, sir.

       THE COURT:  At this time, the Court directs that the

presentence report be placed in the record under seal.

       In accordance with Rule 32 of the Federal Rules of

Criminal Procedure, the Court accepts as accurate the

presentence report, except as to matters in dispute as set

forth in the addendum.

       I have reviewed the entire record, including the

addendum.  The addendum does contain objections.

1          Ms. Allen, does the defendant want to be heard on

2    these?

3          MS. ALLEN:  We do, Your Honor.

4          THE COURT:  All right.  Mr. Locklear, you can have a

5    seat.

6          I'll hear from you.

7          MS. ALLEN:  Your Honor, I do want to apologize.  I

8    didn't introduce the woman sitting beside.  She is a UNC law

9    student.  Her name is Maureen Gleason, and she has assisted

10   with this case, so she'll be joining me at the table.

11         THE COURT:  Good to have you here, ma'am.

12         MS. GLEASON:  Thank you.

13         MS. ALLEN:  With regard to the objections, Your

14   Honor, our very first objection is related to the CI's

15   observations.  There were several controlled buys; and in a

16   couple of the controlled buys, the CI would enter the home and

17   look around and he would see things laying around.

18         Certainly, he saw a gun, that's not in dispute.  But

19   what we do know is that he speculated about drug weights and

20   drug quantities as well as drug -- identifying drugs just by

21   looking at them.  In one case he said he saw heroin in a

22   backpack; and, in fact, he even put a drug weight on it.  The

23   video does show that there's a black backpack, but it does not

24   show at any time anything coming out of the backpack or that

25   there was any kind of discussion about what was in the

backpack or the weight of what was in the backpack.

THE COURT:  Does it affect the guideline?

MS. ALLEN:  It does not affect the guideline, Your Honor.  But for accuracy sake, it does make sense to not allow something that is uncorroborated and unreliable to remain in the PSR.  We would ask that it be stricken.

And that is the same objection as relates to all of the observations that the CI made with regard to drug identification and drug weight.

THE COURT:  All right.  Ms. Webb, do you want to respond to those objections?

MS. WEBB:  Your Honor is correct in that all of the defendant's objections regarding drug weight, both as to the CI's observations and the defendant's objections about the defendant's own statements putting historical weight on them, if all of those objections were sustained, as the PSR notes, there would be no net effect on the guideline range, so the Government's position would be that the guideline sentence based on drug weight as recommended in the PSR is appropriate.

However, the Government would also contend that the CI's observations are not just naked observations, they're corroborated by video recording in which quantities of these drugs can be observed in plain view.

Your Honor, the -- each one of these controlled purchases that the defendant references in the PSR was audio

1  and video recorded; each one of the controlled purchases if

2  drugs are not seen on the table or in the location described

3  because of the view or the angle of the video, there are other

4  details that could be corroborated.

5          For example, in the August controlled purchase, the

6  CI describes seeing drugs contained within a blue cooler

7  that's placed on a table where drugs are packaged for sale.

8  The video clearly shows one of the defendant's bringing a blue

9  cooler into the residence, place that blue cooler on the table

10 well within the view of the confidential informant.

11         During a September controlled purchase, you can see

12 quantities of what appears to be marijuana, quantities of what

13 appears to be cocaine, digital scales, U.S. currency, weapons,

14 the black backpack at issue, all within plain view on the

15 kitchen table.

16         Your Honor, I have screen shots from each of these

17 controlled purchases prepared for the Court's review, if Your

18 Honor would like to see them, as corroborating evidence.

19         I've also interviewed Detective Sealy with the

20 Robeson County Sheriff's Office who participated in each one

21 of these controlled purchases.

22         Detective Sealy is present behind us today.

23 Detective Sealy has confirmed that he's used this confidential

24 informant prior to this buy campaign on several occasions;

25 that this confidential informant provided independently

corroborated information on those prior occasions; and that this confidential informant had provided estimates of drug weights on previous occasions that were deemed to be accurate and credible.

So, Your Honor, if this dispute were relevant as to the PSR sentencing recommendation, the Government would contend that it is accurate by preponderance of the evidence. But at the end of the day, it has no bearing on what the PSR recommends as to this defendant's sentence.

THE COURT: Okay. How about on the issue of whether he was under a criminal justice sentence?

MS. ALLEN: Your Honor, we believe that does, in fact, make a difference because if he was not -- if he was not viewed as being under a criminal justice sentence, it would move him back from a category V to a category IV.

THE COURT: But he doesn't deny selling cocaine after March 27th, 2019, right?

MS. ALLEN: In fact, he does, Your Honor. On the tape he denies it more than once. He denied it twice.

Initially, in the interview he's being interviewed by TFO Roberts and Mr. Roberts is taking it slow and talking to him and asking him questions; Cody is answering the questions, and many times he's just nodding his head.

The conversation goes on, and it goes on and it's a lengthy conversation. TFO Roberts for some reason did not

report the rest of the interview, he ends it without logging

it all.  But there's a second part of the interview where

Cody -- he starts to recap with Cody and he asks him, so how

much were you selling since you came out?  He said, I haven't

done anything since then.  And he specifically says he had not

bought any drugs since he had gone to jail in January.  He's

very specific about that.

        THE COURT:  Right, but that's the different issue,

right?  I mean, we've both been doing this a long enough time

to know that some people go to jail and have a stash and they

get out and they don't have to buy more product; they have the

product.  That's why I asked the question about him selling.

I mean, he is a committed drug dealer, no doubt about that.  I

mean, this record speaks to that, and so that's a different

issue.

        MS. ALLEN:  Yes.

        THE COURT:  So what you're saying is that he didn't

buy it or sell it.  The Government says and the Probation

Office says he sold it even if he contends he didn't buy any

more, like when he got out he got right back at what he does,

he's a drug dealer.

        So you're saying that he didn't.

        MS. ALLEN:  Your Honor, we're saying that Cody

Locklear gave a statement.  In that statement he said that he

was not involved with drugs anymore after that.  He said he

1  didn't know where "Tootie" was.  He said that he wasn't
2  bothering with that anymore.
3          THE COURT:  So from March 27th, 2019 -- and I'm
4  going to have Ms. Webb call a witness if she wants.  And let
5  me just say, acceptance of responsibility is on the table.  It
6  is on the table.
7          So Ms. Webb, call a witness.
8          MS. WEBB:  Your Honor, the Government would call
9  Detective Tim Sealy.
10         MS. ALLEN:  Your Honor, we can withdraw our
11  objection.  We don't have to go through all of that.
12         THE COURT:  I'm perplexed.  Do you contend that he
13  should not get these two points or not?  Because if I hear a
14  witness and if I credit this witness and I find as a fact by a
15  preponderance of the evidence that he, in fact, was, I find
16  this to be a frivolous objection and I will take away
17  acceptance of responsibility.
18         MS. ALLEN:  Your Honor, we don't want that to
19  happen.
20         What I was trying to point out to you is I have not
21  seen in the discovery corroboration about drug sales after
22  that date.
23         THE COURT:  All right.  They are going to put a
24  witness on and I'll listen to the witness.  But I'm telling
25  you that we have drug weight objections that don't affect the

1  guidelines, and I'm going to listen to this witness and we'll

2  see where we are.

3          So come up and be sworn.

4          MS. ALLEN:  Your Honor, we withdraw our objection.

5  We have no objection at this point.  Thank you.

6          THE COURT:  Ms. Webb, how do you want to proceed?

7          Come up and be sworn.

8                       TIMOTHY SEALY,

9          having been duly sworn, testified as follows:

10         THE COURT:  You may examine the witness.

11                    DIRECT EXAMINATION

12 BY MS. WEBB:

13 Q.   Good morning, Detective.  Please state your name for the

14 Court.

15 A.   Timothy Sealy.

16 Q.   How are you employed?

17 A.   I'm a detective at the Robeson County Sheriff's Office.

18 Q.   How long have you been working at Robeson County

19 Sheriff's Office?

20 A.   About three-and-a-half years now.

21 Q.   Are you assigned specifically to the narcotic division?

22 A.   I was.  I'm now on the highway interdiction team for

23 about a year now.

24 Q.   You are a K9 handler?

25 A.   My partner is, yes, ma'am.

T. Sealy - Direct Examination

1  Q.   So you have training and experience related to narcotics

2  investigations; is that right?

3  A.   Yes, ma'am.

4  Q.   And were you involved in the investigation against this

5  defendant, Mr. Cody Locklear?

6  A.   I was.

7  Q.   And you participated in the controlled purchases that

8  were done at various points in time, correct?

9  A.   Yes, ma'am.

10 Q.   And you're aware that in July of 2019 Mr. Locklear was

11 arrested and served with federal warrants related to this

12 case, correct?

13 A.   I am.

14 Q.   And on his arrest in July of 2019 was a cellular

15 telephone seized from his person?

16 A.   Yes, ma'am.

17 Q.   Okay.  And did he give task force officer -- who is no

18 longer with the agency, I think he's changed jobs at this

19 point, but he gave Task Force Officer Roberts permission to

20 search his phone; is that correct?

21 A.   Yes, ma'am.

22 Q.   And have you reviewed some of the contents of the

23 download of that phone?

24 A.   I have.

25 Q.   Okay.  And have you been able to determine from the

1 contents of that phone whether Mr. Cody Locklear appeared to

2 be engaged in drug sales between the end of March of 2019 and

3 July of 2019?

4 A.  Yes, ma'am.

5 Q.  Can you give us some examples of language that would lead

6 you to believe that?

7 A.  Yeah.  Okay.  This would be on May the 30th of 2019 there

8 was a text message -- excuse me.  There was a text message

9 from an individual named -- in the contacts it's Big Bro.  It

10 was May 30, 2019.  It says, Ken got an egg and cousin got a

11 half quarter.  And then this was sent to Mr. Locklear.  Then

12 there's another text right behind that one that says, I told

13 Rico 310.  And Locklear responded, 310 for what?  The Big Bro

14 responded, The ounce and half ounce.  What they say?  He

15 fixing to call back.  And then there's a follow-on text

16 message that says, 210 for the ounce and 100 for the half.

17 Q.  In that exchange does Mr. Locklear in the contact listed

18 as Big Bro appear to be negotiating over the price and

19 quantity of controlled substances?

20 A.  Yes, ma'am.

21 Q.  Is there also material in Mr. Locklear's phone in which

22 he and other individuals discuss the price of eight balls or

23 an eighth of an ounce of controlled substance or the quality

24 of various controlled substances?

25 A.  Yes, ma'am.

1  Q.   And is it true that there are text messages contained in

2  Mr. Locklear's phone referencing girl or fire or gas?

3  A.   There is.

4  Q.   And during the controlled buy campaign of Mr. Locklear,

5  did he use each of those terms to describe cocaine?

6  A.   Yes, ma'am.

7  Q.   Just to be clear, that content was time stamped between

8  the end of March 2019 and July of 2019?

9  A.   Yes, ma'am.

10       MS. WEBB:  Nothing further, Your Honor.

11       THE COURT:  Cross-examination.

12       MS. ALLEN:  We have no questions for this witness.

13       THE COURT:  Thank you, sir.  Please watch your step

14  stepping down.

15       Anybody else want to be heard on the objections?

16       MS. ALLEN:  Your Honor, I still had objections as it

17  related to the overdoses.  We were asking that they be

18  stricken from the PSR.

19       THE COURT:  Okay.  I'll hear from you.

20       MS. ALLEN:  Your Honor, there was certainly

21  information in the discovery that there were people that were

22  passed out and that there was someone that was taken to the

23  hospital, and those were about overdoses.  However, we were

24  not provided with any toxicology reports, any kind of chemical

25  reports that would connect the overdoses that are mentioned in

the discovery directly to anything that was sold by Cody
Locklear.  There is science that is very easy to match up, and
we have none of that.  We don't know who the victims are.  We
don't know what their physical conditions were before or after
they were interviewed by the officers.

What we do know is one person talks about having
smoked crack and having done heroin at the same time.  Those
people are anonymous.  We haven't seen their medical records.
We haven't seen anything that would directly establish that
anything that Cody Locklear sold was responsible.

Your Honor, for those reasons, we would submit that
the Court -- that the Government has not proven beyond a
reasonable doubt a link to any serious physical injury caused
by Cody Locklear.

As a matter of fact, vomiting, passing in and out,
dozing in and out, all of those things can happen with any
drugs sold by anyone.  Heroin addicts take drugs all day long.
Cocaine addicts, all day long, and sometimes they mix them.

We don't know what happened on those particular
occasions, but we would submit to this Court that there is not
enough evidence to support enhancing Cody Locklear's sentence
today based upon that information.

THE COURT:  All right.  I'll hear from the
Government.

MS. WEBB:  Yes, Your Honor.  As to the overdoses,

1  the Government would call Detective Hollis McNeill.

2                          HOLLIS McNEILL,

3           having been duly sworn, testified as follows:

4               THE COURT:  You may examine the witness.

5               MS. WEBB:  Thank you, Your Honor.

6                          DIRECT EXAMINATION

7  BY MS. WEBB:

8  Q.   Detective McNeill, if you don't mind removing your mask

9  just for clarity sake.

10      Please state your name for the Court.

11 A.   Hollis McNeill.

12 Q.   How are you employed?

13 A.   Robeson County Sheriff's Office.

14 Q.   How long have you been with the Robeson County Sheriff's

15 Office?

16 A.   Around thirteen years.

17 Q.   What is your current job assignment?

18 A.   I move all the house arrest pretrial people in Robeson

19 County.

20 Q.   Have you previously worked with the narcotics division in

21 the sheriff's office?

22 A.   Yes, ma'am.

23 Q.   So you are trained and experienced in narcotics

24 distribution investigations; is that correct?

25 A.   Yes, ma'am.

1  Q.   Were you involved in the investigation against the
2  defendant, Cody Locklear?
3  A.   Yes, ma'am.
4  Q.   How did you become involved in that particular
5  investigation?
6  A.   Complaints on overdoses.
7  Q.   Were these overdose complaints within any specific area
8  of Robeson County?
9  A.   Yes, ma'am.
10 Q.   Where was that?
11 A.   On Mount Zion Road, everybody that we spoke with was
12 pretty much adamant about it was near the horse track, and
13 there's only one horse track near there.
14 Q.   And did the descriptions that these victims gave of the
15 residence at issue, did they match a particular residence that
16 y'all were aware of?
17 A.   Yes, ma'am.
18 Q.   And would that be 2051 Mount Zion Church Road address?
19 A.   Yes, ma'am.
20 Q.   Now, the timeframe for those overdose complaints, when
21 would that have been?
22 A.   It was 2018.  I don't know the exact dates.  2018.  I
23 don't have my paperwork.  It's back there.
24 Q.   Does August 2018 sound correct?
25 A.   Yeah, it was on a Friday.  Yes, ma'am, that was it,

1  August 18th.

2  Q.   And these overdoses were all within a short timeframe of

3  each other; is that right?

4  A.   Yes, ma'am.

5  Q.   Now, let's start with August 15th of 2018.  Did y'all

6  receive a complaint of an overdose that occurred on that

7  particular day?

8  A.   Yes, ma'am.

9  Q.   And on that particular day, Robeson County Sheriff's

10  Office responded and found a female and a male passed out in

11  the middle of the roadway essentially; is that right?

12  A.   Yes, ma'am.  Deputy Thomas pulled up on scene.

13  Q.   Is that near the 2051 Mount Zion Church Road area?

14  A.   Yes, ma'am.

15  Q.   Okay.  And describe for us what officers found or what

16  EMS workers found when they arrived to that location?

17  A.   They were unresponsive, short of breath.

18  Q.   Would that be --

19  A.   Trouble breathing.

20  Q.   Both the female and the male?

21  A.   Yes, ma'am.

22  Q.   And did EMS respond to give medical aid?

23  A.   They did, yes, ma'am.

24  Q.   Have you had a chance to review EMS records that you

25  obtained as part of the investigation?

1    A.    Yes, ma'am.

2    Q.    Do the EMS records corroborate that the two people in the

3    vehicle were unresponsive and short of breath?

4    A.    Yes, ma'am.

5    Q.    And if you recall, about how many breaths per minute were

6    these individuals taking?

7    A.    I do not recall the actual breaths per minute, but I know

8    it was really short.

9    Q.    And so it was to the point where medical intervention was

10   necessary; is that right?

11   A.    Yes, ma'am.  Narcan was administered.

12   Q.    To both people?

13   A.    Both people, yes, ma'am.

14   Q.    Were both individuals on scene after receiving Narcan

15   transported to the hospital for further treatment?

16   A.    Yes, ma'am.

17   Q.    Now, did the EMS records indicate that the female and the

18   male victim told them what they had used prior to losing

19   consciousness?

20   A.    Yes, ma'am.

21   Q.    What did both of them say to EMS?

22   A.    I think one said dog food; the other one said heroin.

23   Q.    Based on your training and experience, what is dog food a

24   term for?

25   A.    Heroin fentanyl mixed.

H. McNeill - Direct Examination

1  Q.    Okay.  Now, at some point after these two individuals

2  recovered, were they interviewed by law enforcement or was

3  either of them interviewed by law enforcement?

4  A.    Yes, Ms. Amelia was.

5  Q.    That would be the female that was in the driver seat of

6  that vehicle?

7  A.    Yes, ma'am.

8  Q.    And did she give law enforcement a description of where

9  they had purchased the heroin that they told law enforcement

10  they used?

11  A.    Yes, ma'am.

12  Q.    And where was that?

13  A.    It was on -- right off of Mount Zion near the horse track

14  down a dirt road.  I think that she described it as a brown or

15  bronze-looking trailer, single-wide.

16  Q.    Is that consistent with the 2051 Mount Zion Church Road

17  location?

18  A.    Yes, ma'am.  That's the only one over there in that area.

19  Q.    And when you talked to this female about the heroin she

20  purchased from that location, did she indicate whether or not

21  any drugs were taken between purchasing that heroin and

22  ingesting that heroin?

23  A.    I think early in the earlier hours I think she had had

24  some cocaine, I think.

25  Q.    But between the purchase of the heroin and ingesting that

1  heroin, was anything else taken?

2  A.    No, ma'am.

3  Q.    And how -- did it appear from her statement that it was a

4  brief period of time between purchasing the heroin and

5  ingesting the heroin?

6  A.    Yes, ma'am.

7  Q.    Did she indicate that they used it shortly after leaving

8  that trailer?

9  A.    Yes, ma'am.

10 Q.    Okay.  And was a substance actually collected from her

11 vehicle and field tested by law enforcement?

12 A.    Yes, ma'am.

13 Q.    And what did that field test reveal that substance to be?

14 A.    Positive for heroin.

15 Q.    Now, that was on August 15th of 2018.  Isn't it true that

16 on August 16th of 2018 a controlled purchase was conducted

17 from this defendant and another individual at that 2051 Mount

18 Zion Church Road address?

19 A.    Yes, ma'am.

20 Q.    And are you aware that that substance returned as being

21 positive for fentanyl from the North Carolina State Crime Lab?

22 A.    Yes, ma'am.

23 Q.    Based on your training and experience, is it common in

24 overdose cases for heroin to be substituted with fentanyl?

25 A.    Yes, ma'am.

1  Q.   Now, on August 17th of 2018, did law enforcement respond

2  to another overdose report coming from that same trailer?

3  A.   Yes, ma'am.

4  Q.   And tell us about that second incident.

5  A.   It was a Mr. McNeil and a Mr. Locklear.  We both

6  interviewed both defendants and they both said that James

7  Tyler said he only remembered -- James Tyler is James

8  Locklear, but he said he remembered eating a hamburg and

9  that's all he remembered.

10 Q.   Now, let's walk through this incident.  The Red Springs

11 Police Department responded to report of a vehicle in a

12 roadway with two individuals passed out therein; is that

13 right?

14 A.   Yes, ma'am.

15 Q.   That was these two individuals that you referenced?

16 A.   Yes, ma'am.

17 Q.   Red Springs Police Department at that point in time did

18 not carry Narcan and they radioed to the sheriff's department

19 for assistance, correct?

20 A.   That is correct.

21 Q.   Did EMS also respond to that scene?

22 A.   Yes, ma'am.

23 Q.   Did you collect the EMS reports and review them as part

24 of your investigation?

25 A.   Yes, ma'am.

1  Q.   What did those reports reveal about the state of these

2  two individuals when they got on scene?

3  A.   They were both unresponsive.

4  Q.   And did it appear from the EMS reports that those

5  individuals were having trouble breathing?

6  A.   Yes, ma'am.

7  Q.   Okay.  And based on your training and experience, is that

8  consistent with a heroin overdose?

9  A.   It is.

10  Q.   Now, did EMS administer Narcan to each of those

11  individuals there on scene?

12  A.   Yes, ma'am.

13  Q.   And those individuals were transported to the hospital

14  thereafter?

15  A.   Yes, ma'am.

16  Q.   Did any law enforcement make contact with either of those

17  folks at the hospital?

18  A.   Yes, ma'am.

19  Q.   And what agency would that have been?

20  A.   Robeson County Sheriff's Office.

21  Q.   And did the highway patrol also make contact with the

22  driver of that vehicle?

23  A.   Yes, ma'am.

24  Q.   And were you able to collect that trooper's notes as part

25  of your investigation?

1  A.    Yes, ma'am.

2  Q.    And did those notes reveal that the driver, after having

3  received Narcan, was still having trouble maintaining focus,

4  was nauseous, and was experiencing overdose symptoms?

5  A.    Yes, ma'am.

6  Q.    Now, after these individuals were released from the

7  hospital, did you have a chance to interview both of them?

8  A.    Yes, ma'am.

9  Q.    Now, starting with the driver of that vehicle, what did

10 he tell you about what, if any, substance they had taken?

11 A.    He -- they spoke of dog food, which was heroin, and just

12 said where they purchased it from.  They didn't -- he didn't

13 know the address but said it was near the horse track, down a

14 dirt road and gave us a description of and told us -- he

15 actually said he actually got it from Cody, and he know Cody

16 from the streets.

17 Q.    The description of the residence, was that the same

18 description that the first overdose victim gave you about

19 where the heroin was purchased?

20 A.    Yes, ma'am.

21 Q.    And was that consistent with what y'all knew to be 2051

22 Mount Zion Church Road?

23 A.    Yes, ma'am.

24 Q.    You said this driver specifically mentioned seeing Cody

25 at that address.  Did he indicate that Cody was the one that

1  he conducted a deal with?

2  A.   Yes, ma'am.

3  Q.   And what comments did he make about the drugs that Cody

4  was selling?

5  A.   It was killing people.

6  Q.   And did you have a chance to speak to the passenger in

7  that vehicle as well?

8  A.   Yes, ma'am.

9  Q.   And did the passenger give a similar description of where

10  they purchased the heroin from?

11  A.   Yes, ma'am.

12  Q.   And in speaking with the driver and the passenger of that

13  vehicle, did they indicate that they used this heroin shortly

14  after leaving the residence?

15  A.   Yes, ma'am.

16  Q.   Did they discuss using any other drugs between leaving

17  the trailer where they purchased the heroin and ingesting it?

18  A.   No, ma'am.

19  Q.   Were any other drugs found in their vehicle?

20  A.   No, ma'am.

21  Q.   Now, based on this information and your observations of

22  the 2051 Mount Zion Church Road residence, you applied for a

23  State Court search warrant to search that location; is that

24  right?

25  A.   Yes, ma'am.

1    Q.   And the information about the overdoses that you

2    discussed here in court you included in your search warrant

3    application, didn't you?

4    A.   Yes, ma'am.

5    Q.   And did a Superior Court judge upon reviewing that

6    information find that there was probable cause to search that

7    location?

8    A.   Yes, ma'am.

9              MS. WEBB:   Nothing further at this time.

10             THE COURT:   Cross-examination.

11                          CROSS-EXAMINATION

12   BY MS. ALLEN:

13   Q.   Good morning, Detective McNeill.

14   A.   How are you?

15   Q.   Good.

16        You testified about three instances -- three instances:

17   One from August 15th, and two different instances from

18   August 17th, and two different people from August 17th, right?

19   A.   Amelia and Carpenter were together and James and Tyler

20   were together.

21   Q.   The first one, was that Amelia and the other person?

22   A.   Yeah, I'll have to get my notes, but, yeah.

23   Q.   Let's just talk about the first one.

24        You testified that they said that they had both had

25   heroin, one of them called it dog food?

1   A.   Yes, ma'am.

2   Q.   Right.  Did they tell you that directly?  Were you the

3   person that interviewed them?

4   A.   I interviewed Amelia.

5   Q.   You interviewed Amelia.  She also told you that she had

6   been smoking crack, right?

7   A.   Earlier that day, yes, ma'am.

8   Q.   You don't know how long -- how much time had passed

9   between the time she last smoked crack and the time that she

10  decided to ingest heroin, do you?

11  A.   It was before they dropped Carpenter off at the field, so

12  it was before 11:30.

13  Q.   You don't know how much time had passed between the time

14  she took crack and the time she took heroin, do you?

15  A.   No, ma'am.

16  Q.   And you don't know how much crack she took, do you?

17  A.   No, ma'am.

18  Q.   And you don't know if she took more heroin prior to

19  taking the crack that day, do you?

20  A.   No, ma'am.

21  Q.   You don't know how much crack she took the day before, do

22  you?

23  A.   No, ma'am.

24  Q.   Or whether she continued to smoke crack and take heroin

25  the days after?

1    A.    No, ma'am.

2    Q.    The same thing with her companion.  What was her

3    companion's name?

4    A.    I don't know if they're companions, but it was

5    Mr. Carpenter.

6    Q.    They were together, right?

7    A.    Yes, ma'am.

8    Q.    That's all I meant.  I wasn't trying to imply a

9    relationship.

10         With regard to him, you don't know what his drug history

11    was, do you?

12    A.    No, ma'am.

13    Q.    You don't know how much heroin he took that day, do you?

14    A.    No, ma'am.

15    Q.    You don't know where he got all the heroin that he may

16    have taken from, do you?

17    A.    No, ma'am.

18    Q.    You don't know if he took something other than heroin

19    that day?

20    A.    No, ma'am.

21    Q.    The same question really applies to the next two people

22    that you talked about.  And, I'm sorry, their names were kind

23    of confusing.  Who told you that he was eating a hamburger and

24    that's all he remembered?

25    A.    James Locklear.

1  Q.   James Locklear.  Now, James Locklear was found on the

2  road, unresponsive on the road along with someone else?

3  A.   Yes, ma'am.

4  Q.   And your testimony connects them buying heroin from Cody

5  or from the home where Cody was living, right?

6  A.   Yeah, that was Jayson.

7  Q.   Okay.

8  A.   McNeil.

9  Q.   So during the interview, you don't know anything about

10  James' medical history, do you?

11  A.   No, ma'am.

12  Q.   You don't know how long he had been using heroin?

13  A.   No, ma'am.

14  Q.   You don't know how much heroin he used every day?

15  A.   No, ma'am.

16  Q.   But as a law enforcement officer, you know that heroin

17  addicts pretty much use heroin all day long?

18  A.   I don't make that assumption.

19  Q.   But as a law enforcement officer, in your experience,

20  people who are addicted to heroin have to have it every day,

21  right?

22  A.   They use.

23  Q.   And they get up looking for it?  They wake up looking for

24  it?

25  A.   I'm not making that assumption.

1 Q.   Okay.  Again, you have no idea how much drugs James

2 ingested before he ever even went to the trailer on Mount Zion

3 Road, do you?

4 A.   No, ma'am.

5 Q.   You don't know how much drugs he ingested after he went

6 to the trailer on Mount Zion Road, do you?

7 A.   No, ma'am.

8 Q.   Or the following day after the Narcan made him feel

9 better, do you?

10 A.   No, ma'am.

11 Q.   And the same would apply to the fourth fella, you have no

12 idea how many drugs that person took on any day, do you?

13 A.   No, ma'am.

14 Q.   You said somebody told you they were having a hard time

15 focusing or had some dizziness.  Which one told you that?

16 A.   Ms. Amelia, I think.  About all of them told me that

17 honestly when I interviewed them.  They were all having

18 problems, symptom -- symptomatic problems, I guess.

19 Q.   Out of those symptoms, you don't know when those symptoms

20 started, do you?

21 A.   No, ma'am.

22 Q.   You don't know if they have problems focusing and

23 dizziness the day before or for weeks at a time, do you?

24 A.   No, ma'am.

25 Q.   So you really aren't in a position to say that anything

1  that Cody Locklear did caused their dizziness or their trouble

2  focusing, are you?

3  A.    No, ma'am.

4          MS. ALLEN:  Nothing further.

5          THE COURT:  Anything else?

6          MS. WEBB:  Yes, Your Honor.

7                   REDIRECT EXAMINATION

8  BY MS. WEBB:

9  Q.    Detective McNeill, when you talked to these individuals,

10  did you make it clear that the purpose of your conversation

11  was to attempt to determine who caused these overdoses and who

12  is selling the heroin at issue?

13  A.    Yes, ma'am.

14  Q.    Okay.  Did it appear that each of those individuals that

15  you interviewed understood that?

16  A.    Yes, ma'am.

17  Q.    Okay.  And based on your training and experience in law

18  enforcement, do you believe that each of those individuals

19  provided credible information to you about the source of their

20  heroin?

21  A.    Yes, ma'am.

22  Q.    Do you believe they provided credible information to you

23  about what drugs they ingested leading up to their loss of

24  consciousness?

25  A.    Yes, ma'am.

H. McNeill - Recross-Examination

1  Q.   Based on your training and experience dealing with heroin

2  and heroin overdoses, does a heroin overdose take hold of

3  somebody quickly?

4  A.   Yes, ma'am.

5  Q.   Okay.  So there would not be time for somebody to seek or

6  use other drugs between ingesting the heroin and loss of

7  consciousness; is that right?

8  A.   Usually, they're disoriented.

9  Q.   So the effects of such an overdose are quick to come on

10 to somebody; is that right?

11 A.   Yes, ma'am.

12 Q.   And loss of consciousness obviously would preclude

13 somebody from seeking or using other drugs?

14          THE COURT:  Yes, ma'am.

15          MS. WEBB:  Nothing further, Your Honor.

16          THE COURT:  Anything else?

17                  RECROSS-EXAMINATION

18 BY MS. ALLEN:

19 Q.   Detective McNeill, you're not a chemical expert, are you?

20 A.   No, ma'am.

21 Q.   And you haven't reviewed any labs or chemical analysis

22 that would connect anything that may have sickened the people

23 you talked about to anything sold by Cody Locklear, have you?

24 A.   No, ma'am.

25          MS. ALLEN:  Thank you.  Nothing further.

```
 1              THE COURT:  On the August 15th, the initials A.S.,
 2    you said that was Ashley?
 3              THE WITNESS:  Amelia.
 4              THE COURT:  Did you know her last name?
 5              THE WITNESS:  What's that last name?  Scott.
 6              THE COURT:  Scott?
 7              THE WITNESS:  Scott.
 8              THE COURT:  And then the other one was D.C.
 9              THE WITNESS:  David Carpenter.
10              THE COURT:  And then the August 17th one were the
11    two males.  Tell me their names again.
12              THE WITNESS:  One was Jayson McNeil and the other
13    one was James Tyler Locklear.
14              THE COURT:  James Tyler Locklear?
15              THE WITNESS:  Yes, sir.
16              THE COURT:  Which of them said that he bought the --
17    on the 8/17 one, you said one of them knew Cody Alexander
18    Locklear from the streets and he had bought the dog food from
19    him.  Who was that?
20              THE WITNESS:  That was Jayson McNeil.
21              THE COURT:  And you did that interview, right?
22              THE WITNESS:  Yes, yes.
23              THE COURT:  Any follow up on that?
24              MS. WEBB:  No, sir, Your Honor.
25              THE COURT:  Any follow up on that?
```

1          MS. ALLEN:  No, Your Honor.

2          THE COURT:  Thank you.  Sir, please watch your step

3  stepping down.

4          Anything else?

5          MS. WEBB:  Yes, Your Honor.  Based on the evidence

6  from Detective McNeill, the Government would contend that an

7  upward departure or variance --

8          THE COURT:  I'm not to that point yet.  I'm going

9  to --

10         MS. WEBB:  The Government would just point out that

11 the factual information about the overdose that was included

12 in the PSR's original draft was not objected to by the

13 defendant if you reviewed the addendum.  So therefore the

14 Court can take that information in addition to what Detective

15 McNeill has told us today in court about that as true.

16         The PSR included information about both A.S. and

17 D.C. and the overdose incident with J.L. and J.M., made

18 reference to that.  It was unequivocal what the reference was

19 about; and in the initial draft of the PSR, the defendant did

20 not object to that information.  So while that does not play

21 into the guideline calculation, the Government would contend

22 that the Court can accept that information as true in both its

23 decision regarding guideline sentencing and any other motions

24 that are before the Court.

25         THE COURT:  Ms. Allen?

1          MS. ALLEN:  Your Honor, with regard to the

2    Government's position that we did not object, I will take full

3    responsibility for that.  That was something that we intended

4    to object to from the very beginning.  The drug calculations

5    got very cumbersome and at some point I was so focused on

6    trying to clear up what the CI saw versus what was actually

7    obtained that I failed to raise that objection.

8          I did try to address the objection as clearly as I

9    could in the sentencing memorandum so that the Court would be

10   aware of our position.  I didn't realize that I had failed to

11   object to them until I began to work on the memorandum and

12   read the Government's motion.

13          So we would ask you to consider it an objection at

14   this point.

15       (Pause in the proceeding.)

16          MS. ALLEN:  Your Honor, may I add something?

17          THE COURT:  Yes.

18          MS. ALLEN:  We would suggest that it would have been

19   helpful to have some sort of expert that could talk about a

20   connection to what was being sold to the people that were

21   actually victims.  And it's very unfortunate to hear that they

22   are addicted and were having overdoses, but we would submit to

23   this Court that the Government has not proven beyond a

24   reasonable doubt --

25          THE COURT:  You think that's the standard at

1    sentencing, beyond a reasonable doubt?

2              MS. ALLEN:  No, not at sentencing, Your Honor.  It's

3    not, but --

4              THE COURT:  The standard is preponderance.

5              MS. ALLEN:  By a preponderance of the evidence.

6    Again, we would suggest to this Court that serious injury has

7    not been proven.  A trip to the hospital alone doesn't do it,

8    vomiting doesn't do it, somebody zoning in and out off drugs

9    doesn't do it.  We'd ask you to consider those things, Your

10   Honor.

11             Thank you.

12             THE COURT:  Thank you.

13        (Pause in the proceeding.)

14             THE COURT:  In connection with the objections that

15   are in the PSR, the first objection is to the confidential

16   informant's observations on August 16th, 2018, September 27th,

17   2018, and October 15th, 2018.

18             The second objection in the PSR is this objection to

19   being held accountable for the amphetamine found during the

20   execution of the search warrant, but that objection appears to

21   have been withdrawn at Docket Entry 118, page 2, Footnote 1.

22             The third objection is to the drug weight on

23   March 27th, 2019, to July 17th, 2019, as reflected in the

24   third objection in the addendum.

25             With respect to the first and third objection, they

do not affect the drug weight for purposes of the advisory guideline calculation.  At sentencing the Government must prove the drug quantity attributable to the defendant by preponderance of the evidence.  *See United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011).

The Court may consider relevant information without regard to the admissibility at trial providing that the information has sufficient indicia reliability to support its probable accuracy.  *See United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013).

The Government has to present evidence from which the sentencing Court may proximate the quantity.  *See Bell*, 667 F.3d 441.

The Court can rely on hearsay testimony of a lay witness.  *See Crawford*, 734 F.3d at 343.

Here, again, the drug weight itself doesn't affect the advisory guideline calculation.  I do think the probation officer properly described the evidence and I overrule the objection, although it doesn't affect the advisory guideline range.

As to the fourth objection, the defendant denies selling drugs between March 27th, 2019, and July 17, 2019, therefore he objects to the application of the two additional history points for which he was under a criminal justice sentence.

We had a discussion about this. Ms. Webb called a witness, Ms. Allen then attempted to withdraw the objection after being advised that acceptance of responsibility was at issue.

I do find the testimony of Detective Sealy from the Robeson County Sheriff's Office to be credible and persuasive.

I do find that Cody Alexander Locklear, as reflected in particular in the text messages from on or about May 30th, 2019, reflect that he was engaged in selling cocaine and that he falsely denied that as part of this; that he should get the two criminal history points.

Section 4A1.1(d) provides that if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status gets two points.

Having credited the evidence the Government has presented and looking at Locklear's status at the time as of May 30th, 2019, the probation officer properly scored that.

As for the issue associated with paragraph 19 and paragraph 21, the defendant didn't timely object to that. Pursuant to Rule 32, the Court already accepted that as accurate. Alternatively, I have considered the evidence by a preponderance of the evidence. I do credit the testimony of Detective Hollis McNeill. Detective McNeill testified credibly concerning his role in the investigation and his

interactions and review of other materials concerning Amelia
Scott and David Carpenter on August 15th, 2018, and Jayson
McNeil and Tyler Locklear on August 17th, 2018.

He credibly testified, and I find by a preponderance
of the evidence that the probation officer did properly score
and describe the events of responding by the Robeson County
Sheriff's Office to an overdose of Amelia Scott and David
Carpenter on or about August 15th, 2018.  They had to be
administered Narcan.  One described getting heroin; one
described getting dog food.  Dog food street name is
heroin-fentanyl mix.  And the description of Ms. Amelia Scott
where she was interviewed, she had purchased the narcotics at
the trailer with a description of 2051 Mount Zion Church Road.
There's only one there that fit the description.

I do find by a preponderance of the evidence that
she did use that heroin shortly after that; that heroin did
field test positive as heroin.  I do find that was by a
preponderance what caused her to overdose that day, along with
David Carpenter.

And in accordance with Agent McNeill's credible
testimony, I also find that the events of August 17th, 2018,
are properly recounted in paragraph 21.  Agent Hollis McNeill
or Detective Hollis McNeill credibly testified and explained
the interactions initially of the Red Springs Police
Department upon finding Jayson McNeil and James Tyler

1  Locklear. EMS having to respond to provide Narcan to the two
2  individuals and then the interaction with the State Highway
3  Patrol, as well as the detective's interview of the driver
4  describing that he had obtained dog food from Cody Alexander
5  Locklear, who is the defendant in this case.

6         By preponderance of the evidence I do find he was
7  the one who sold the heroin-laced fentanyl to the individuals
8  in the car, Jayson McNeil and James Tyler Locklear; and I do
9  find by preponderance of the evidence that Probation has
10 properly recounted Cody Alexander Locklear's sale of these
11 narcotics and overrule the objections.

12        All right. I'll hear from the Government.

13        So for purposes of *Booker* and its progeny, the total
14 offense level is 29, the criminal history category is V, the
15 advisory guideline range on Count 1 and 7 is 140 to 175
16 months; on Count 11, it's five years consecutive.

17        I'll hear you on your upward departure motion.

18        MS. WEBB: Yes, Your Honor.

19        As the Court has discussed, the Court has found by
20 preponderance of the evidence that these overdoses did occur
21 and that these overdoses could be attributed to the heroin
22 that was sold by this defendant or at this defendant's
23 residence from which drug operations were occurring.

24        The Government in its upward departure motion
25 discusses these overdoses. And in the alternative, if the

Court were inclined to consider an upward variance instead

discusses the nature and characteristics of this defendant in

that this defendant has had numerous State Court convictions

for drug distribution and for weapons possession.  This

defendant has had instances where his probation was revoked

due to non-compliance.  This defendant was on pretrial release

for the State Court charges which he later pled guilty to and

served that two months we've heard about.  He was on pretrial

release for those charges during the entire course of this

relevant conduct, went to prison, and then got back out and

continued selling drugs, as the Court heard.

I think it's also especially relevant in considering

the necessity of an upward departure or variance the fact that

this defendant was involved in selling heroin from a location

where multiple overdoses relate to where fentanyl was

purchased during that same timeframe.  That residence was

searched in August of 2018 and instead of wrapping things up

and saying, hey, y'all caught me, I'm done or saying, you

know, hey, this heroin stuff is really dangerous maybe I

should stop selling it, this defendant's reaction to being

searched by law enforcement is to just pick up and move to a

new house.

As the Court notes from the PSR, the September and

October 2018 controlled purchases, one of which was also for

heroin fentanyl and a fentanyl analogue were just conducted at

a separate location.  He simply picked up his operation and moved.

 And I would represent to the Court that the discovery actually includes text message conversations between this defendant and the confidential informant about how he's got a new spot because the other spot got too hot or drew too much law enforcement attention.

 So, Your Honor, there was no remorse or hesitation about continuing to poison the community with heroin fentanyl and fentanyl analogue after this search warrant occurred.

 Your Honor, the case laws I noted in my motion is fairly sparse on the applicability of 5K2.2 in the instance of drug overdose incidents.  However, I was able to locate the case cite.  It's *United States v. Prince* from the Sixth Circuit which does specifically find in the case of a heroin overdose where the victim lost consciousness in a store, was administered Narcan, regained consciousness in the store, and then refused further medical attention and refused to go to the hospital.  The Court found that application of 5K2.2 for physical injury in that instance was appropriate.  And in that case, the Court heard testimony from the case agent about reduced respiration rate, about loss of consciousness.  And that's what we got with all four of the overdose victims in the case before the Court here today.

 We heard testimony about administration of Narcan,

loss of consciousness, reduced breathing rate, and all four of
our victims required transport to the hospital for further,
more advanced medical treatment.  They were unable to just get
up and leave the store where they overdosed or the location
where they overdosed without further medical intervention.

        The Prince case describes how permanent injury or
injury that requires surgical intervention or other types of
injuries are not required for the 5K2.2 enhancement to apply.

        And this case also discusses that courts have also
found that overdoses are appropriate reasons to upwardly vary
if the Court is not convinced that 5K2.2 does apply
specifically to those circumstances.

        I would also note, Your Honor, that there is no case
out there holding that these overdoses are supposed to be
proven beyond a reasonable doubt in a sentencing context or
that the heroin has to be proven to be the sole, only cause of
symptoms.

        We've got the _Burrage_ case cited in the defendant's
sentencing memo; but at this point in time, there's nothing
extending _Burrage_ to sentencing for relevant conduct rather
than sentencing for an actual distribution causing death,
which is not what we've charged the defendant here with today.

        Your Honor, the Government would request that this
Court depart upward two levels; one level for each overdose
incident, taking us from total offense level 29 to 31.  As the

defendant is a criminal history category V, that would move
our guideline range up to 168 to 210 months.  The Government
would be requesting a sentence at the top of that guideline
range, 210 months.

          And, Your Honor, looking at all of the factors in
3553, the need to protect the public from this defendant, the
need to stop his drug dealing, the need to deter people in
Robeson County from disseminating these deadly chemicals to
the public, the sentencing factors support an imposition of
that kind of sentence.

          THE COURT:  Plus the 60?

          MS. WEBB:  Yes, sir.  Plus the 60 months for the
924(c), giving us a total sentence of 270 months.

          THE COURT:  All right.  I'll hear from Ms. Allen.

          MS. ALLEN:  Your Honor, we understand that you found
by a preponderance of the evidence that Cody was somewhat
responsible for the overdoses.  We would suggest to you that
an upward variance and an upward departure, or both, are not
appropriate in this case.  And certainly, Cody has accepted
responsibility for what he was doing; but at the time I don't
think Cody really appreciated the full effect of what was
going on.

          His guideline is 200 to 235, 200 months to 235
months if you add on the 60 months to the first two counts, as
you will.  Cody has never served more than two years, more

than two years incarcerated.  And while it does appear that he
has -- he did not learn his lesson -- we know that he didn't
learn his lesson or he wouldn't be here today.  For him to
actually serve a sentence of what the Government is asking,
270 months, that is over 20 years -- that is actually 22,
around 22 years in prison.

Cody is 28 years old.  Now, I would never attempt to
minimize the fact that someone was very sick and that
addiction is a serious problem, but what we do know is that
Cody has some redeemable qualities and those are things I'll
be happy to go into now, Your Honor, and why the variance is
not necessary and would actually be greater than sufficient.

First of all, the characteristics of the defendant
would show that when Cody was about 11 years old his mom and
dad separated.  Cody went to live with his dad.  Cody told me
his dad was his best friend.  But by the time Cody got to be
14 years old, his dad was suffering from diabetes; he was
suffering from -- he was having to go to dialysis, and
eventually got cancer.  Cody was the only one there with his
dad.  So at 14 he became the primary caregiver for an adult.
So he struggled, but he took care of his father.  There was no
nurse coming in.  They had no medical insurance.  He had to
cook, he had to clean, he had to bathe his father, and he
still graduated high school.  He said he was also responsible
for doing yard work and everything else that needed to be

1    done, but he was being a faithful, loyal son.

2         I bring this up because we heard all the bad things

3    that Cody did today, but this was a child whose childhood was

4    interrupted and whose parents were not around.

5         At one point his mom did say you can come back home,

6    son.  But Cody couldn't leave his dad, his dad didn't have

7    anybody else to take care of him and he just could not do that

8    to his father.

9         By the time Cody was 18, he was using cocaine and

10   marijuana.  By the time he was 19, he had a kid.  By the time

11   he was 21, he had a second kid.  The only girlfriend he's ever

12   had, they have two children, and she's still sticking by him.

13   But he's someone who slid into trouble early on and never got

14   out of it.  And I'm sure he'd never admit it, I'm sure he

15   never dreamed he'd be here today but, of course, we all see

16   how obvious it was that he would be here today; but not Cody.

17   He's 28 years old and few of us at 28 years old we're looking

18   very far down the road about what we were doing back then.  A

19   few of us may have been but very few.

20        I don't think that Cody really appreciated the risk

21   and the consequences of his actions.  Unfortunately, today he

22   stands here to be sentenced before you.  And even the

23   guideline without any variance and with any departure is sky

24   high for someone that is 28 years old who has a rather slight

25   record.  His guideline would be 200 to 235, even without the

guideline -- wait a minute. 140 to 175 plus 60 would be 200
to 235.

        We submit to this Court that is certainly sufficient
to meet the purposes of sentencing. He can be rehabilitated.
He will be incapacitated. He will miss out on his entire
youth, at this point what youth he has left. He's 28, but at
this point by the time he gets out, he'll be close to 50, even
if he gets sentenced at the guideline that we are facing
without an upward departure.

        He's not a career offender. If he got out and got
in trouble again he would come back as a career offender and
would be sentenced to just a mountain of time, a bigger
mountain than what he's already facing right now.

        He has two children that he loves and who he was
trying to take care of. He did try to rehabilitate himself.
He was trying to turn his life around. I actually have the
paystubs that he had started working at this roofing company
called Master Build Enterprises. I had them send me all of
their paperwork, and I have several paystubs to show -- and I
have a copy, I thought, for the Government. These are just
weekly paystubs to show he was, in fact, trying to get himself
together.

        The paystubs vary. He wasn't working the same
amount every week. One week he might make 300. Some of them
show 450. Here is one that shows 600. So it varied.

1          But, Your Honor, I point that out not to take away

2   from the bad that he's done but to show he was trying to do

3   something good.  He didn't get it right, obviously.  He got it

4   very wrong, but he was trying to turn things around.

5          I received character letters.  They were too late to

6   send to the Court.  I did not want to violate the policy and

7   send them late, but those letters were from his girlfriend's

8   mom and her brother, and they both talked about how he had

9   always -- even as a very young man losing his dad, his dad had

10  passed away at 18, but it talked about how Cody took his being

11  a father very seriously and was always talking to the boys and

12  always trying to make sure the family had what they needed.

13         Your Honor, we certainly see young men in here who

14  have children scattered around a community and they're not

15  taking care of them.  That's not who Cody Locklear was or who

16  he is today.

17         He has no history of violence.  He graduated high

18  school, so he's able to learn some skills through the BOP

19  programs and to do better.

20         We're asking you to consider these things and to

21  sentence him in the guideline range without an upward

22  variance, without an upward departure.

23         THE COURT:  Thank you.

24         At this time I'll hear from Mr. Locklear, if you'd

25  like to make a statement about your sentence, sir.

1          THE DEFENDANT:  Your Honor, I would just like to
2  start off and say I apologize and say how sorry I am for so
3  many choices I've made in life.  And at the time I was just in
4  an unstable environment.  Even though my parents taught me
5  drugs were wrong, I saw so much of it and was so used to it, I
6  just made bad decisions and started doing the same thing.
7  Even though I was never a violent person, I still did things I
8  shouldn't have and was not thinking clearly for myself and
9  others.

10          I just want to say I'm sorry for the decisions I've
11  made and the people I may have hurt.  And I just want to say
12  I'm sorry, Your Honor.  That's it.

13          THE COURT:  Thank you.  Anything else, Ms. Webb?

14          MS. WEBB:  No, sir, Your Honor.

15     (Pause in the proceeding.)

16          THE COURT:  All right, Mr. Locklear.

17          The Court recognizes its obligation to impose a
18  sentence sufficient but not greater than necessary to comply
19  with the purposes set forth in the statute.

20          I have considered all arguments your lawyer has
21  made.  I have considered your statement.  I have considered
22  the position of the United States.  I have considered the
23  advisory guideline range.

24          Among other things, I'm to consider the nature and
25  circumstances of the offense and the history and

characteristics of the defendant, the need for the sentence
imposed to reflect the seriousness of the offense, to promote
respect for the law, and to provide just punishment; the need
for the sentence imposed to deter others who might choose to
engage in the criminal behavior that brings you here; the need
for the sentence imposed to protect the public from further
crime by you; the need for the sentence imposed to provide you
with needed educational or vocational training, medical care,
or other correctional treatment in the most effective manner.

        The statute lists numerous other factors.  I've
considered all those factors, although I won't mention each
one individually.

        As for the nature and circumstances of the offense,
you did plead guilty to three offenses:  Conspiracy to
distribute and possess with the intent to distribute 40 grams
or more of a mixture and substance containing a detectable
amount of fentanyl, 10 grams or more of a mixture and
substance containing a fentanyl analogue, and a quantity of
heroin and quantity cocaine; Count 7, distribution of 10 grams
or more of a mixture and substance containing a detectable
amount of fentanyl analogue, quantity of heroin, and 40 grams
or more of a mixture and substance containing a detectable
amount of fentanyl; and possession of firearms in furtherance
of a drug trafficking crime.

        Your offense conduct is described in detail in the

PSR.  I do find it to be an accurate description.  Between December 2017 and July 17th, 2019, you're conservatively responsible for distributing 41.96 grams of fentanyl analogue, 1.4 kilograms of marijuana, 41.89 grams of fentanyl, .68 grams of Oxymorphone, 240.98 grams of heroin, 28.35 grams of crack cocaine, .33 grams of amphetamine, and 3.061 kilograms of cocaine.

Additionally, you possessed three firearms in connection with the drug trafficking activities.  You maintained a premises for purpose of manufacturing and distributing a controlled substance.

You obviously engaged in all of this conduct over a long period of time, including, as Ms. Webb pointed out, a time period where there's a search warrant executed at the Mount Zion Church Road residence on August 24th, 2018, and you ultimately then move your operation and continue to engage in narcotics trafficking as reflected in paragraphs 24, 25, 26, 27, 28, and 29.

During that period you also -- February 5th, 2019, as reflected in paragraph 41, pleaded guilty to possession of a firearm by a felon and got a 23- to 40-month sentence.  You were released to post-release supervision in March of 2019 and you obviously continued to engage in drug dealing as reflected in the testimony of Detective Sealy and as recounted in the PSR.  Obviously, not good at all in terms of somebody not

learning a thing from having gone to prison for criminal behavior.  Having been the subject of a search warrant, not stopping and reflecting someone who claims he wants to be a good father.  Good fathers don't sell poison to other people. You don't poison other people's children to feed your own. That's not being a good father; that's being terrible.

This type of behavior needs to be punished, it needs to be deterred, people who engage in it need to be incapacitated, society needs to be protected from people who deal drugs like the ones you're dealing.  It's ravaging communities, and you're part of the problem.

Today, you will reap what you have sown.  You will harvest what you have planted.  Your decisions have consequences.  You'll feel the full force of those consequences today.

I'm not going to upwardly depart or upwardly vary, but I am going to impose a sentence that will incapacitate you; that will provide just punishment.

I've taken into account all the arguments your lawyer has made about your efforts at working, about your age, about the amount of time you'll spend in prison, but you have had many opportunities to reflect on the choices you're making along the way.  You have continued to persist in dealing drugs and this other criminal behavior that has serious effects on individuals.

1          Thankfully, none of these people died.  But it's

2    clear to me that you were selling drugs that were getting them

3    on the edge.  That's a choice you've made and you'll pay a

4    price for that.  The message needs to go back to Robeson

5    County, if you decide to be a heroin dealer, cut it with

6    fentanyl or use a fentanyl analogue and you come here, the

7    punishment will be severe, and it should be.  This needs to

8    stop.

9          Too many people are being harmed by people like you

10   who choose greed over the betterment of the community.  And

11   you do it again and again, day after day, week after week,

12   month after month.

13         Having fully considered the entire record in the

14   case, the need to incapacitate this defendant, the need to

15   provide just punishment, it's the judgment of the Court that

16   Cody Alexander Locklear is hereby committed to the custody of

17   the Bureau of Prisons to be imprisoned for 174 months on

18   Counts 1 and 7 to be served concurrently, and 60 months

19   consecutive on Count 11 for a total sentence of 234 months.

20         Pursuant to the plea agreement, Counts 3, 4, 5, 8,

21   9, and 10 are dismissed.

22         I've also signed the forfeiture order.

23         Upon release, you'll be on supervised release for

24   five years.  This consists of five years on Counts 1, 7, and

25   11 to run concurrently.

You'll comply with the mandatory and standard
conditions and the following additional conditions:  You'll
participate in a narcotic addiction treatment program, consent
to a warrantless search, cooperate in the collection of DNA,
support your children.  You will have a job while you're
incarcerated.  I'm not going to impose a fine.  Any money you
earn will go to support your children.  They at least deserve
that.  They deserve a lot more from anybody who claims to want
to be a good father.  You'll pay a special assessment of $300,
which is due immediately.  I'm not going to impose a fine.

I do think I've properly calculated the advisory
guideline range, but I announce pursuant to *U.S. v.
Gomez-Jimenez,* 750 F.3d 370 (4th Cir. 2014) and *U.S. v.
Hargrove,* 701 F.3d 156 (4th Cir. 2012), that I'd impose the
same sentence as an alternative variant sentence.  This is the
sentence sufficient but not greater than necessary for
Mr. Locklear in light of all the 3553(a) factors that I
discussed.

In addition, I have considered all frivolous and
non-frivolous arguments made by each side.  To the extent this
sentence is in any way inconsistent with the sentence
advocated for by counsel, it's because I have weighed the
3553(a) factors differently than they have.  I have considered
all their arguments.  I reject those arguments that are in any
way inconsistent with the sentence I have announced.  This is

the sentence sufficient but not greater than necessary for
Cody Alexander Locklear in light of all the 3553(a) factors
that I have discussed.

Mr. Locklear, you can appeal your conviction if you
believe that your guilty plea was somehow unlawful or
involuntary or if there's some other fundamental defect in the
proceeding that was not waived by your guilty plea.

You also have a statutory right to appeal your
sentence under certain circumstances, particularly if you
think your sentence is contrary to law.

However, you did enter into a plea agreement that
contains an appellate waiver.  In light of your sentence, I
believe you waived your right to appeal your sentence.

If you believe the waiver is unenforceable or
inapplicable for any reason, you can present that theory to
the Appellate Court.

With few exceptions, any Notice of Appeal must be
filed within 14 days of the judgment being entered on the
docket in your case.

If you're unable to pay the cost of an appeal, you
may apply for leave to appeal *in forma pauperis*.

If you so request, the Clerk of Court will prepare
and file a Notice of Appeal on your behalf.

Did you want me to make any recommendations?

MS. ALLEN:  Your Honor, we'd ask for Bennetsville.

```
 1            THE COURT:  I recommend FCI Bennetsville.  Recommend
 2   vocational/educational opportunities.
 3            Anything else?
 4            MS. ALLEN:  No.  Thank you, Your Honor.
 5            THE COURT:  Anything else, Ms. Webb?
 6            MS. WEBB:  No, sir, Your Honor.
 7            THE COURT:  I thank counsel for their work here
 8   today.  That'll conclude the matter of Mr. Locklear.
 9            Good luck to you, sir.
10                          *      *      *
11             (The proceedings concluded at 11:16 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                     UNITED STATE DISTRICT COURT

2                  EASTERN DISTRICT OF NORTH CAROLINA

3

4

5                   CERTIFICATE OF OFFICIAL REPORTER

6

7          I, Amy M. Condon, CRR, RPR, CSR, Federal Official

8    Court Reporter, in and for the United States District Court

9    for the Eastern District of North Carolina, do hereby certify

10   that pursuant to Section 753, Title 28, United States Code,

11   that the foregoing is a true and correct transcript of the

12   stenographically reported proceedings held in the

13   above-entitled matter and that the transcript page format is

14   in conformance with the regulations of the Judicial Conference

15   of the United States.

16

17

18   Dated this 5th day of October, 2020.

19

20                                    _____

21                                    /s/ Amy M. Condon
                                      Amy M. Condon, CRR, CSR, RPR
22                                    U.S. Official Court Reporter

23

24

25